IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **JAMES WINCHESTER,** | Case No. 5:17 CV 532 |
| Petitioner, | Judge James Gwin |
| v. | Magistrate Judge James R. Knepp, II |
| **WARDEN MARY POTTER,** | |
| Respondent. | REPORT AND RECOMMENDATION |

### INTRODUCTION

*Pro se* petitioner James Winchester ("Petitioner"), a prisoner in state custody, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 4). Respondent Mary Potter, Warden of the Belmont Correctional Institution ("Respondent") filed an answer (Doc. 12), and Petitioner filed a response in opposition (Doc. 15). Respondent filed a sur-reply. (Doc. 16). The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated March 20, 2017). For the reasons discussed below, the undersigned recommends the Petition be denied.

### FACTUAL BACKGROUND

For the purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, erroneous factual findings by the state court. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530.

The Ohio Ninth District Court of Appeals, Summit County, made the following findings of fact:

> {¶ 7} Here, the charges against Mr. Winchester stem from the alleged kidnapping and rape of a then seventeen-year-old girl, L .L. On appeal, Mr. Winchester maintains that the weight of the evidence does not support that he kidnapped and raped L.L., but, instead it demonstrates that he and L.L. engaged in consensual sexual conduct on the night at issue. We will therefore limit our discussion of the evidence to that which pertains to the issues of kidnapping and consent as a defense to rape.
>
> {¶ 8} As part of its case-in-chief, the State presented the testimony of L.L., L.L.'s grandmother, a sexual assault nurse examiner, officers from the Akron Police Department, and Mr. Winchester's former girlfriend, Precious Allen. L.L. testified that, in the late hours of July 17, 2012, she was walking along Copley Road in Akron, heading home from a friend's house. While she was walking, two men, whom she did not know but had previously seen in the neighborhood, pulled up next to her in a sports utility vehicle and told her to get in. She said no, and she kept walking. However, the car then stopped, and a man wearing a square earring and "gold teeth," whom she later identified as Mr. Winchester, got out of the car and told her to get in. She complied because she was scared. They then drove to a house, where the passenger got out of the car. After the passenger went into the house, Mr. Winchester told L.L. to get out of the backseat of the car. As they stood outside of the car, Mr. Winchester began touching her thighs underneath her dress. He then told her to get into the front passenger seat. L.L. complied because she was still scared. Mr. Winchester then drove down a street near Buchtel High School. He began touching her again. Mr. Winchester stopped the car, got out, walked to the passenger side, and opened the door and tried to kiss her. She bit his lip. He then pulled her out of the car, and they began wrestling. As the struggle ensued, L.L. found herself at the front of the car, and Mr. Winchester began banging her head on the car by forcing her head down while holding the back of her neck. She told him to stop, but every time she did, he would bang her head on the car. At this point, L.L.'s back was facing Mr. Winchester, and she was facing the front of the car. He then put his penis in her vagina. She told him to stop, and he refused. She eventually stopped resisting because every time she struggled, he hit her head against the car. Thereafter, she got back in the truck, and Mr. Winchester drove her to her grandmother's home. She went in the bathroom of grandmother's home, where she was crying and shaking. At some point, her grandmother came in, and she relayed to her grandmother what had happened.
>
> {¶ 9} On cross-examination, L.L. confirmed that she owns a cell phone; however, she could not recall if she had it in her possession on the night at issue. L.L. further indicated that she would not normally walk home, but it was around midnight, and she was supposed to have already been home. L.L. maintained that she got in the car when Mr. Winchester told her to because she was scared. He did not throw her

in the car, he did not threaten her, and she saw no weapon in his possession. After they dropped off the passenger, L.L. got out of the backseat through the backseat door, opened the front passenger seat door, and got back into the car. When they stopped the second time, which was at a house on Packard Drive, Mr. Winchester pulled her out of the car by her wrists, and she tried to run, but she could not get away. L.L. further acknowledged that, although she had seen Mr. Winchester previous to the attack, she did not know him or his sister, he did not father her child who was born previous to the attack in December of 2010, and she had never been to his home. After the attack, she asked him to take her home, and she showed him which way to go until they were almost there, at which point she told him to stop, and she got out of the car and walked the rest of the way. L.L. recalled that she had bruises on her neck and right upper arm as a result of the attack, but she did not have any bruising on her face resulting from Mr. Winchester slamming her head into the car.

{¶ 10} L.L.'s grandmother testified that, during the night at issue, she awoke upon hearing L.L. crying. She found L.L. curled in the fetal position on the bathroom floor. After L.L. had explained the attack, her grandmother called the police and the paramedics. L.L. was then taken to the hospital, where she was given a sexual assault exam. On cross-examination, L.L.'s grandmother indicated that she had never seen Mr. Winchester or heard his name prior to the instant proceedings.

{¶ 11} Jennifer Diamond, a sexual assault nurse examiner, testified that she examined L.L. at the hospital. Ms. Diamond obtained a narrative from L.L., who was shaking and crying. L.L. told the nurse that she was walking home from a friend's house when two men approached her in a car and asked if she needed a ride. L.L. said she did not, but then "one of them jumped out and threw her into the car." The men then drove to a home to drop off the man in the passenger seat, "[a]nd at that point [L.L.] was begging for them to let her go. But after the passenger got out of the car * * * the driver told her to get into the passenger's seat[.]" He then began to touch her all over her body, and she asked him to stop. He responded that he was going to take her somewhere "where no one could see." He drove her to a house near Buchtel High School and parked in the driveway. He then "threw" her out of the car and "pushed" her up against the car. She was fighting and screaming to get away from him. He tried to kick her and was covering her mouth. He then "grabbed her in the back of her neck and pushed her * * * face first against the front of the car." He pinned her wrists behind her back and put his penis and fingers into her vagina. He then drove her home, called her a "bitch," and told her to get out. L.L. indicated that she did not know her attacker, but she had seen him before.

{¶ 12} After taking L.L.'s narrative, Ms. Diamond performed a physical exam on L.L. and collected samples for a sexual assault kit.[1] Ms. Diamond noted abrasions on L.L.'s sternum and breast. She also noted multiple reddened contusions on her left and right wrists and abrasions on her labia. Ms. Diamond photographed the injuries, and these pictures were submitted into evidence.

3

{¶ 13} On cross-examination, Ms. Diamond indicated that the injuries she observed were consistent with the history that L.L. provided. However, the abrasions to her vagina also could have been consistent with consensual sex. Ms. Diamond did not recall or document any injuries to L.L.'s head or face.

{¶ 14} Officer Mathew Hackathorn testified that he responded to the hospital in response to the report of rape. L.L. informed the officer that she did not know who her attacker was, but gave a description of the man to the officer. Her description included that the man was wearing a square earring and a blue "do-rag." The officer then notified the detective bureau. On cross-examination, Officer Hackathorn indicated that he believed that L.L. had said that, previous to this incident, she had seen her attacker on the west side of Akron, but she did not know who he was.

{¶ 15} Detective Crystal Bowen Carter of the Akron Police Department testified that she received the police report alleging that L.L. had been raped, and she also received a report from the hospital on July 18, 2011. As part of her investigation, she spoke with L.L. that day. When L.L. arrived at the police station, the detective could see injuries on L.L.'s upper arms, which L.L. indicated she received during the attack. L.L. explained to the detective that she did not know the identity of her attacker, but gave the officer a physical description of the man and a description of the car. The description included that he had a "square earring, a do-rag, [and] a grill [.]" Detective Bowen Carter then placed a "be on the lookout" alert ("BOLO") for a man or vehicle matching the description. However, when nothing came in as a result of the BOLO, Detective Bowen Carter sent the sexual assault kit to BCI for testing. She later learned that the DNA collected in the samples in the kit matched the DNA of Mr. Winchester.

{¶ 16} On cross-examination, Detective Bowen Carter maintained that she did not photograph the injuries that she observed to L.L.'s arms, because she believed that the hospital had already photographed the injuries. Detective Bowen Carter further acknowledged that, in L.L.'s statement to her, she reported that the driver of the car got out of the car, "grabbed her right wrist," and demanded that she get in the car. L.L. reported that they then dropped off the male passenger at a house on Thornton Street, at which point her attacker pulled her out of the car and pushed her against it. However, the lights in the passenger's house came on, and her attacker said that "he wasn't going to do it right there because his friend was watching him." The detective confirmed that she did not ask L.L. why she did not attempt to run while she was out of the vehicle.

{¶ 17} Precious Allen testified that she has a child with Mr. Winchester. In July of 2011, Mr. Winchester was residing with her. She recalled that, one night in July, at approximately 2:00 a.m., he came home with his t-shirt ripped and his rosary necklace broken. At that time, he was wearing square earrings and a gold "grill," and he had a "do-rag" on his head. Ms. Allen asked him what had happened, but he would not tell her. On April 12, 2012, Mr. Winchester called her from jail and told her that he needed her to say that he was with her on July 17, 2011.

4

{¶ 18} On cross-examination, Ms. Allen acknowledged that she could not remember the exact date that Mr. Winchester had come home with his t-shirt ripped and his necklace broken; although she did know that it was late at night in July of 2011. Further, she remembered in the phone call from Mr. Winchester that he told her to tell the truth. She further acknowledged that she was upset with Mr. Winchester due to the difficulties in their relationship.

{¶ 19} The defense provided the testimony of Kiana Winchester, Mr. Winchester's sister. Ms. Winchester testified that she knows L.L., and she knew L.L. when she was pregnant. At that time, she had come to Ms. Winchester's house to braid Mr. Winchester's hair. After L.L. had her baby, she came back to Ms. Winchester's house to again braid Mr. Winchester's hair. While she was there, Ms. Winchester asked if she could see a picture of L.L.'s baby, and she showed her a picture on a social media website. On the night of the purported attack, Ms. Winchester saw Mr. Winchester pull into their driveway, and she could see a female in the front seat, but she could not see her face. On cross-examination, Ms. Winchester acknowledged that her brother had sent her a letter while he was incarcerated awaiting trial, but she maintained that she had thrown the letter away.

*State v. Winchester*, 2013 WL 5773444 (Ohio Ct. App.) (footnote omitted).

## PROCEDURAL HISTORY

State Court Conviction

In April 2012, a Summit County Grand Jury issued an indictment charging Petitioner with one count of kidnapping in violation of Ohio Revised Code § 2905.01(A)(2), and one count of rape in violation of Ohio Revised Code § 2907.02(A)(2). (Ex. 1, Doc 12-1, at 3-4). Petitioner pleaded not guilty to both charges. (Ex. 2, Doc. 12-1, at 5).

A jury found Petitioner guilty as charged. (Ex. 3. Doc. 12-1, at 6). However, the verdict journal entry from the trial listed an incorrect Ohio Revised Code section number for rape. *Id*. The trial court subsequently filed a *nunc pro tunc* entry correcting the typographical error. (Ex. 4, Doc. 12-1, at 8).

At the sentencing hearing in September 2012, the trial court found, pursuant to Ohio Revised Code 2929.14(C)(4), consecutive sentences for these crimes were necessary to protect the public and punish the offender. (Ex. 5, Doc. 12-1, at 10). Petitioner was sentenced to an aggregate

5

18-year prison sentence — a mandatory eight years for kidnapping, and a mandatory ten years for rape. *Id*.

Direct Appeal

On October 4, 2012, through new counsel, Petitioner timely filed a Notice of Appeal to the Ohio Ninth District Court of Appeals. (Ex. 6, Doc. 12-1, at 13). In his memorandum in support, Petitioner raised the following assignments of error:

1. APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF STRICKLAND V. WASHINGTON, THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

2. APPEALLANT WAS DENIED DUE PROCESS OF LAW, PURSUANT TO THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION SIXTEEN OF THE OHIO CONSTITUTION, WHEN COUNSEL WAS NOT PERMITTED TO QUESTION THE COMPLAINING WITNESS's MOTIVES IN HIS CLOSING ARGUMENT.

3. THE TRIAL COURT ERRED WHEN IT IMPOSED CONSECUTIVE SENTENCES FOR KIDNAPPING AND RAPE, IN VIOLATION OF THE DOUBLE JEOPARDY CLAUSES OF THE OHIO AND UNITED STATES CONSTITUTIONS, STATE V. JOHNSON, AND SECTION 2941.258 OF THE OHIO REVISED CODE.

4. APPELLANT's CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

(Ex. 9, Doc. 12-1, at 34-35). The State filed a brief in response. (Ex. 10, Doc. 12-1, at 63). On October 23, 2013, the Ninth District Court of Appeals affirmed Petitioner's convictions and sentence. *See State v. Winchester*, 2013 WL 5773444 (Ohio Ct. App.).

On April 18, 2016, Petitioner filed an untimely, *pro se*, Notice of Appeal (Ex. 12, Doc. 12-1, at 123), and a Motion for Delayed Appeal (Ex. 13, Doc. 12-1, at 125) to the Ohio Supreme Court. In his Memorandum in Support, Petitioner asserted his appellate counsel discouraged him

from pursuing an appeal to the Ohio Supreme Court, and that he only recently learned – through an inmate law clerk – the appeal was necessary for him to pursue the claim further in Federal court. (Ex. 13, Doc. 12-1, at 127).

On June 15, 2016, the Ohio Supreme Court denied Petitioner's Motion for Delayed Appeal and dismissed the case. (Ex. 14, Doc. 12-1, at 155).

*Post-Conviction Petition*

On December 21, 2016, Petitioner filed a Post-Conviction Petition in the Summit County Court of Common Pleas. (Ex. 15, Doc. 12-1, at 156). In it, he asked the court to order a DNA test on the victim's child, asserting it would show he is the child's father and thereby prove the victim knew him prior to the attack and perjured herself when she testified she did not. (Ex. 15, Doc. 12-1, at 158). Petitioner asserted the child is a product of a prior romantic relationship between himself and the victim. *Id*.

On February 1, 2017, the trial court denied the Petition. (Ex. 17, Doc. 12-1, at 164). The court found Petitioner was not entitled to a hearing as a matter of right because he had not set forth sufficient facts to establish a substantive ground for relief. *Id*. The court also held it lacked jurisdiction to consider his untimely Petition for relief. *Id*.

### FEDERAL HABEAS CORPUS

Petitioner filed a *pro se* Petition with the United States District Court on March 14, 2017. (Doc. 4). Petitioner raises four grounds for relief:

> **GROUND ONE:** The Petitioner received ineffective assistance of counsel in violation of his rights pursuant to the Sixth Amendment to the United States Constitution and Section 10 Article 1 of the Ohio Constitution.
>
> **GROUND TWO:** The trial court committed error when it imposed consecutive sentences for kidnapping and rape, in violation of the double

>   jeopardy clause of the United States Constitution. State v. Johnson, and Sec. 2941.25 of the Ohio Revised Code.
>
> **GROUND THREE:** The Appellant was denied Due Process of law, pursuant to the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sec. 16 of the Ohio Constitution, when counsel was not permitted to question the complaining witness's motives in his closing arguments.
>
> **GROUND FOUR:** Appellant's conviction is against the manifest weight of the evidence, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sec. 10 and 16 of the Ohio Constitution.

(Doc. 4, at 5-9).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005). An application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Thus, a court may grant habeas relief if the state court arrives at a conclusion that is contrary to a decision of the Supreme Court on a question of law, or if the state court decides a case differently than did the Supreme Court on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

## DISCUSSION

Respondent contends the Petition is time-barred, procedurally defaulted, and lacks merit. (Doc. 12, at 9). Petitioner does not respond to Respondent's timeliness argument, but asserts his claims are not procedurally defaulted and he is entitled to relief. (Doc. 15, at 9). For the reasons outlined below, the undersigned finds the Petition was not timely filed as required under the AEDPA and therefore recommends the Petition be denied.

The AEDPA provides for a one-year statute of limitations during which a prisoner in state custody may file a petition for habeas relief in federal court. 28 U.S.C. § 2244(d)(1). The limitation period begins with any of the following scenarios, whichever is latest:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Here, Respondent correctly asserts 28 U.S.C. § 2244(d)(1)(A) is the appropriate point of reference. (Doc 12, at 10). Petitioner provides no argument for application for a different start date, and all claims in his Petition relate to alleged errors in the trial process. (Doc. 4, at 5-10). Under § 2244(d)(1)(A), cases become final when the time to file an appeal has expired. *Lawrence v. Florida*, 549 U.S. 327, 333 (2007). Although the statute of limitations is "not jurisdictional," it

"effectively bars relief absent a showing that the petition's untimeliness should be excused based on equitable tolling and actual innocence." *Akrawi v. Booker*, 572 F.3d 252, 260 (6th Cir. 2009).

In this case, the Ninth District Court of Appeals affirmed Petitioner's conviction on October 23, 2013. (Ex. 11, Doc. 12-1, at 176-77). Under Ohio Supreme Court Practice Rule 7.01(A)(1), Petitioner had 45 days to file a timely appeal to the court. As Respondent correctly asserts, Petitioner's conviction became final on December 9, 2013—the expiration of the 45-day period. *See Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 459-60 (6th Cir. 2012) (citing *Gonzalez v. Thaler*, 132 S. Ct. 641, 653-54 (2011)). The statute of limitations began running the following day—December 10, 2013—and expired one year later, on December 10, 2014. *See* Fed R. Civ. P. 6(a); *Bronaugh v. Ohio*, 235 F.3d 280, 285 (6th Cir. 2000). Thus, the Petition—filed over two years later on March 14, 2017—is time-barred under § 2244(d)(1)(A) absent statutory tolling, equitable tolling, or a showing of actual innocence.

*Statutory Tolling*

A properly filed post-conviction petition can serve to toll the statute of limitations in habeas cases. 28 U.S.C. § 2244(d)(2). A state application for post-conviction relief is "properly filed" within the meaning of § 2244(d)(2) "when its delivery and acceptance are in compliance with the applicable laws and rules governing filings, such as those prescribing the time limits for filing." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000). State courts are the final arbiters of whether a state collateral action is considered timely, and thus, properly filed. *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005). A state post-conviction petition rejected by the state court on timeliness grounds is not properly filed and, therefore, it cannot serve as the basis for statutory tolling. *Allen v. Siebert*, 552 U.S. 3, 5 (2007). Further, once the statute of limitations expires, state collateral review proceedings can no longer serve to avoid the time-bar. *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003)

("The tolling provision does not, however, revive the limitations period (i.e., restart the clock at zero); it can only serve to pause a clock that has not yet fully run.") (internal quotation and citation omitted).

Respondent asserts statutory tolling is not applicable in this case because Petitioner's AEDPA statute of limitations expired prior to the filing of his post-conviction petition. (Doc. 12, at 11). Petitioner does not argue statutory tolling in his Petition or respond to Respondent's arguments on the issue in his Traverse. Regardless, Respondent is correct. As noted above, Petitioner's one year AEDPA statute of limitations expired on December 10, 2014. He did not file his post-conviction petition until December 21, 2016 – over two years after the statute of limitations had run. (Ex. 15, Doc. 12-1, at 156). Because the post-conviction petition was filed after the expiration of the statute, it cannot serve as a basis to preserve statutory tolling. *Vroman*, 346 F.3d at 602; *Jurado v. Burt*, 337 F.3d 638, 641 (6th Cir. 2003) ("a motion for state post-conviction review that is filed following the period for seeing habeas relief cannot toll that period because there is no period remaining to toll").

*Equitable Tolling*

Petitioner bears the burden of establishing his entitlement to equitable tolling. *See Jurado*, 337 F.3d at 642. To meet this burden, Petitioner must show that: 1) extraordinary circumstances prevented the filing of his petition, and 2) he was diligent in pursuing his case. *Holland v. Florida*, 560 U.S. 631, 649 (2010). Equitable tolling should only be granted "sparingly". *Solomon v. United States*, 467 F.3d 928, 933 (6th Cir. 2006).

In this case, Petitioner does not specifically refer to equitable tolling in his Petition or Traverse. The pleadings of a petition drafted by a *pro se* litigant are held to less stringent standards than formal pleadings drafted by lawyers, and will be liberally construed – but the rule is not

11

limitless. *Urbina v. Thoms*, 270 F.3d 292, 295 (6th Cir. 2001) (citing *Cruz v. Beto*, 405 U.S. 319 (1972)). Construing the Petitioner's filings liberally, in his Memorandum in Support of a delayed appeal to the Ohio Supreme Court, Petitioner appeared to offer a reason for the delay in his appeals. (Ex. 13, Doc. 12-1, at 127). Petitioner asserted his appellate counsel discouraged him from pursuing an appeal to the Ohio Supreme Court, and he only recently learned – through an inmate law clerk – such an appeal was necessary for him to pursue his claims further in Federal court. *Id*.

Ineffective assistance of counsel may constitute extraordinary circumstances sufficient to warrant tolling. *Robinson v. Easterling*, 424 F. App'x 439, 442 (6th Cir. 2011). However, any such circumstance only warrants tolling if it was beyond the control of the litigant and unavoidable with reasonable diligence. *Id*. Further, ineffective assistance of counsel either at trial or on direct appeal is not an excuse for failure to diligently pursue a habeas claim. *Garner v. Gansheimer*, 2010 WL 547482, at *7 (N.D. Ohio) (citing *Winkfield v. Bagley*, 66 F. App'x 578, 583 (6th Cir. 2003)). Here, Petitioner has not set forth any facts or circumstances in his Petition or Traverse to show he acted diligently in pursuing habeas relief. Thus, Petitioner has not shown he is entitled to equitable tolling because he has not shown "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing". *Holland*, 560 U.S. at 649.

*Actual Innocence*

Actual innocence, if proven, can excuse a statute of limitations bar to review of a petitioner's claims but requires the petitioner to demonstrate that "in light of ... new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). "In other words, a credible showing of actual innocence may allow a prisoner to pursue

his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *Id.* at 1931. In the extreme circumstance, a petitioner can prove his entitlement to equitable tolling through a showing of actual innocence under the "miscarriage of justice" standard. *Schlup v. Delo*, 513 U.S. 298 (1995). In order to advance a credible actual innocence claim, however, the petitioner must support his allegations with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup,* 513 U.S. at 324.

The Supreme Court has repeatedly counseled that actual innocence is an exception that is rarely granted, and only in the most extraordinary circumstances. *See id.* (reasoning that, because new reliable evidence will be unavailable "in the vast majority of cases, claims of actual innocence are rarely successful"); *see also McQuiggin*, 569 U.S. at 386 ("We caution, however, that tenable actual-innocence gateway pleas are rare."); *House v. Bell*, 547 U.S. 518, 538 (2006) ("The *Schlup* standard is demanding and permits review only in the 'extraordinary' case.") (quoting *Schlup*, 513 U.S. at 327)).

In his Traverse, Petitioner does not explicitly claim innocence, but asserts the victim in his case perjured herself when she testified she and Petitioner did not have a consensual romantic relationship at the time the incident occurred. (Doc. 15, at 9, 12). To support this claim, Petitioner attached two affidavits. (Doc. 15-1, at 2-4). The first, dated June 8, 2017, is from Teon Stallworth who avers she personally introduced the victim and Petitioner and, on the night in question, spoke with Petitioner who told her that he "had to kick [victim] out the car cause she was on some bull shit." (Doc. 15-1, at 2). The second affidavit, dated May 26, 2017, is from Jeffery Brown who avers he has known the victim since "'07 or '08", and introduced the victim to Teon Stallworth.

13

(Doc. 15-1, at 4). Mr. Brown states "we have known the alleged victim [] for years prior to the incident taking place." *Id*.

Here, Petitioner's evidence speaks to alleged perjury, not to actual innocence of the crime. Neither affiant was an eyewitness to the crime, nor do they offer any scientific insight or knowledge of other physical evidence. Because the affidavits are not evidence of innocence, they cannot serve as a basis to overcome the statute of limitations bar. *See Schlup,* 513 U.S. at 324.

Because the Petition is untimely, and Petitioner has not shown any basis for tolling, or actual innocence to excuse the expiration of the statute of limitations, the undersigned recommends the Court deny the Petition. (Doc. 4).[1]

### CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the undersigned recommends the Petition be denied.

s/James R. Knepp, II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

---

1. Because the Petition is untimely filed under AEDPA, it is unnecessary for the undersigned to reach the additional arguments raised by Respondent and Petitioner regarding procedural default and the merits.

14